Electronically Filed
Intermediate Court of Appeals
CAAP-13-0003941
26-FEB-2015
08:06 AM

NO. CAAP-13-0003941

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee, v.
TOBY J. STANGEL, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 11-1-0803)

MEMORANDUM OPINION
(By:  Fujise, Presiding Judge, Leonard and Ginoza, JJ.)

Defendant-Appellant Toby J. Stangel (Stangel) appeals from the Circuit Court of the First Circuit's (Circuit Court) August 14, 2013 Judgment of Conviction and Sentence.[1]

On June 3, 2011, beginning at about 12:30 a.m., Stangel fired several shots at motorists stopped at the intersection of Kapiolani Boulevard and Waialae Avenue. Stangel shot at Michael Pagdilao three times. Stangel shot and killed Tammy Nguyen in front of her teenaged daughter, Cindy Nguyen, discharging nine shots. Stangel drove onto the H-1 Freeway in a westbound direction and, near the Likelike offramp, shot at Amie Lou Ascuncion three times, hitting her once in the back. Stangel shot Samson Naupoto, who attempted to help Amie Lou Ascuncion, once in the leg. Proceeding further west on the Moanalua Freeway by the H-1 off-ramp, Stangel fired four or five shots at HPD Officers Robertson and Ogasawara, who were supporting a traffic stop. Stangel was eventually apprehended near the Kaamilo Street overpass on the H-1 Freeway.

---

[1]      The Honorable Glenn J. Kim presided.

I.

On June 8, 2011, the State charged Stangel via indictment as follows:

- Cts 1-2: Attempted Murder in the First Degree, in violation of Hawaii Revised Statutes (HRS) §§ 705-500, 707-701(1)(b), and 706-656;

- Ct 3: Attempted Murder in the First Degree in violation of HRS §§ 705-500, 707-701(1)(a), and 706-656;

- Ct 4: Murder in the Second Degree, in violation of HRS §§ 707-701.5 and 706-656;

- Cts 5-8: Attempted Murder in the Second Degree, in violation of HRS §§ 705-500, 707-701.5, and 706-656;

- Cts 9-13: Carrying or Use of Firearm in the Commission of a Separate Felony, in violation of HRS § 134-21;

- Ct 14: Place to Keep Pistol or Revolver, in violation of HRS § 134-25;

- Ct 15: Possession of Prohibited Detachable Ammunition Magazine, in violation of HRS § 134-8(c) and (d);

- Ct 16: Promoting a Dangerous Drug in the Second Degree, in violation of HRS § 712-1242(1)(b)(i);

- Ct 17: Unlawful Use of Drug Paraphenalia, in violation of HRS § 329-43.5(a);

- Ct 18: Promoting a Harmful Drug in the Fourth Degree, in violation of HRS § 712-1246.5;

- Ct 19: Place to Keep Ammunition, in violation of HRS § 134-27; and

- Ct 20: Promoting a Detrimental Drug in the Third Degree, in violation of HRS § 712-1249.

**Expert Testimony Regarding Capacity.**

On January 20, 2012, forensic psychiatrist Dr. Marvin W. Acklin (Dr. Acklin) submitted a written report to the defense based upon his independent mental examination of Stangel. Dr. Acklin reported in relevant part

2

> At the time of the criminal offenses it is my opinion that Mr. Stangel's cognitive and volitional capacities were substantially impaired as a result of substance-induced psychotic disorder with delusions and polysubstance intoxication. The substance intoxication diagnoses are validated by positive drug screens obtained in the aftermath of the shootings. There is strong support from collaterals that Mr. Stangel was experiencing a substance-induced psychotic disorder with paranoid delusions for many months and perhaps years before the shooting incidents, associated with active severe polysubstance abuse and dependence.

Dr. Acklin's report concluded that "[Stangel's] loss of self-control during the shooting appears to be the combined result of psychosis and drug intoxication."

On January 25, 2012, counsel for Stangel moved for an HRS § 704-404 Examination, which was granted by the Circuit Court. All three examiners reported that they believed Stangel was fit to proceed to trial and his cognitive or volitional capacities were not substantially impaired at the time of the alleged offenses. On April 9, 2012, the Circuit Court at the hearing found that Stangel was fit to proceed.

On April 12, 2013, the State filed a Motion in Limine seeking an order precluding Stangel from calling Dr. Acklin "as a witness on the issue of Insanity [sic] until [Stangel] can establish that his testimony is relevant." At the hearing on the motion, with regard to the issue of penal responsibility, the Circuit Court ruled that "Dr. Acklin's testimony is completely irrelevant, in total, on the issue of a 704 defense[.]" With regard to the issue of pathological intoxication, the Circuit Court explained that

> In order for Dr. Acklin to be qualified to even opine on this issue, it seems, to me, he would have to know, number one, exactly how much -- the amount of the various drugs Mr. Stangel took on that night because the amount of the intoxicant is an element. And then given the amount of the intoxicant, Dr. Acklin would have to be able to testify . . . as to what the, for lack of a better word, "normal" or "usual effect" of that much cocaine, marijuana -- whatever it is -- has on a so-called normal, usual person, and then would also have to opine that it was gross -- that Mr. Stangel's reaction to the self -- to the drugs he voluntarily took was somehow grossly excessive to the amount that he took. And it doesn't end there. It's gotta be the result of a physical abnormality of the defendant.
>
> Dr. Acklin, in his report, gives almost a full page of his qualifications. I don't see medical doctor there anywhere. He's a clinical psychologist. There is no way on God's green earth Dr. Acklin is qualified to opine on pathological intoxication, period. So I think he would be precluded from rendering an opinion on that, also.

The Circuit Court granted the State's Motion in Limine and excluded all of Dr. Acklin's expert testimony.

On May 3, 2013, the Circuit Court apparently agreed to hold a hearing to reconsider its decision granting the State's Motion in Limine to preclude Dr. Acklin from testifying. Regarding Dr. Acklin's expert testimony on the issue of penal responsibility, the Circuit Court questioned Dr. Acklin at length in order to make sure that "the record's real clear on this[.]"

Q: Doctor, is it your opinion, which is another way of saying can you opine, that the defendant was suffering from a mental disease, disorder or defect prior to any voluntary substance abuse on his part, at any time in his life?

A: It would be my opinion that he did not.

Q: Okay. All right. So it follows from your opinion then that any mental disease, disorder or defect that the defendant has suffered in his life was due to substance abuse.

A: Yes, sir. That would be my opinion. I believe there's good facts to support that.

Q: And the early substance abuse, for example, on page 12 of your report, you detail some of the things the father told you, things like when he was about 13, he started doing drugs across the street. He never lied about it. He wanted me to eat hallucinogenic mushrooms with him. This is Waialua High, in the ninth grade. He's hanging around with the wrong crowd. He was hanging around with, quote, all the wrong kids. Drugs, rebellions, mushrooms, LSD, and ice. They are aware he was also doing IV heroin. This is when he's 13 and 14 years old, according to the father, right?

A: Yes, sir. That's my understanding too.

Q: And on those occasions it was voluntary substance abuse, was it not? He didn't have this settled insanity at the time?

A: That's correct. I think that it would be fair to say that at the very beginning of his career, his very initial acts were voluntary. In other words, they were a choice --

Q: Right.

A: -- that he made when he was 12 or 13 years of age.

. . . .

Q: . . . Voluntary substance abuse, in some manner, shape or form, either from when he's 13, 14, 15, or on the night in question, or both, was at least a substantial factor in his penal irresponsibility, correct?

A: Yes, sir.

. . . .

Q: I understand. And you do -- and I understand totally that you distinguish and differentiate between the intoxication which induced the irresponsibility on the night

in question, from the settled insanity, for lack of a better way of putting it, that he may have been suffering years prior to the incident in question, right?

A: Yes, sir.

The Circuit Court concluded that "any testimony [Dr. Acklin] would have would be, given the law of this jurisdiction, simply irrelevant. And certainly would be totally confusing and misleading to the jury."

Regarding Dr. Acklin's expert testimony on the issue of pathological intoxication, Dr. Acklin proffered testimony that Stangel suffered from "sensitization," a physical abnormality. According to Dr. Acklin, "sensitization" means "an individual whose brain has been sensitized to crystal methamphetamine can, months or years after abstinence, take a dose . . . an ordinary person would take and not become psychotic, and actually have . . . a full-blown resurgence of psychotic symptoms." As with the issue of penal responsibility, the Circuit Court questioned Dr. Acklin at length in order to clarify his testimony on pathological intoxication.

Q: . . . Now, let me ask you some other questions, just so we clear up this pathological intoxication issue, because that was one of the early offers of proof on Mr. Schum's part. And I know you may very well disagree with the statutory definitions, et cetera. But if you could just answer these questions.

A: Yes, sir.

Q: Do you know exactly what substances the defendant ingested prior to the incidents in question?

A: I have the report that he provided to me, supported by some drug testing that was done at the time of his arrest. So I believe I have a reasonably good understanding. Yes, sir.

Q: Do you know in exactly what amounts, for each drug, he ingested that night?

A: No, sir. No, sir.

Q: Do you know what are the usual effects, on an otherwise normal person, of each substance, in the specific amount he ingested?

A: Yes, sir. I mean, I have had years of experience of working with individuals in all forms of drug intoxication and dependency states.

. . . .

Q: . . . Let's assume that there were some grossly excessive effects. Okay. What is the physical or bodily abnormality suffered by the defendant which caused them?

A:  It's called sensitization.

Q:  [The abnormality] was caused by the already maybe years long use of substances, or abuse of substances, correct?

A:  That's correct.  The usage, the continuous or chronic usage, actually has the opposite effect of the opiates.  It is called sensitization.  And sensitization is a situation where actually smaller and smaller amounts of drug ingestion, or amount ingested, will have similar effects. For example, an individual whose brain has been sensitized to crystal methamphetamine can, months or years after abstinence, take a dose that would -- an ordinary person would take and not become psychotic, and actually have a resurgence of -- a full-blown resurgence of psychotic symptoms.

Q:  And, again, do you know exactly what amounts of what drugs, of exactly what drugs, he took that night?

A:  No, sir.

The Circuit Court concluded that

at very least, the doctor would have to know exactly what amounts, of specifically what drugs, Mr. Stangel had taken that night.  That's a predicate to whether the reaction would be grossly excessive in degree, et cetera.  And Dr. Acklin, quite frankly and candidly, said he doesn't know.  And so the -- some of the essential predicates for an opinion on pathological intoxication are missing.

The Circuit Court denied Stangel's Motion for Reconsideration.

**Motion to Suppress Stangel's Pre-Miranda Statement.**

On February 27, 2013, Stangel filed a Motion to Suppress Statements in order to suppress and exclude from use at trial "any and all statements obtained from a warrantless seizure and custodial interrogation of [Stangel.]"  The motion specifically sought to suppress a statement he made on June 4, 2011 while in custody at the Hawai'i Police Department main station.  Stangel argued that the statement (1) was not made pursuant to a valid Miranda waiver because it was not knowingly, intelligently, and voluntarily made; (2) was the product of duress or coercion; and (3) stemmed from an illegal pre-interview that took place before he was Mirandized.  On April 3, 2013, the Circuit Court granted Stangel's Motion to Suppress Statements.

**Jury Instructions**

On May 14, 2013, the Circuit Court instructed the jury. Regarding Count 4, Murder in the Second Degree, the Circuit Court instructed the jury, in relevant part, that

6

> If you find that the prosecution has proven beyond a reasonable doubt that the defendant committed the offense of Murder in the Second Degree or the included offense of Reckless Manslaughter in Count 4, then you must also answer the following question on a special interrogatory form which will be provided to you.
>
> "Did the defendant have in his possession or threaten its use or use a semi-automatic firearm whether loaded or not and whether operable or not while engaged in the commission of Murder in the Second Degree or Reckless Manslaughter in Count 4?" Your answer must be unanimous. If you are unable to come to a unanimous answer, then you must not check off either "Yes" or "No" on the interrogatory form.

Identical language appeared on the actual forms provided to the jury. The Circuit Court gave identical instructions for Counts 5-8.

Regarding Count 9, Carrying or Use of Firearm in the Commission of a Separate Felony, the Circuit Court instructed the jury, in relevant part, that

> A person commits the offense of Carrying or Use of a Firearm While Engaged in the Commission of a Separate Felony if he knowingly carries on his person, knowingly has within his immediate control, intentionally uses, or intentionally threatens to use a firearm while engaged in the commission of a separate felony whether the firearm was loaded or not and whether it was operable or not.
>
> There are two material elements of the offense of Carrying or Use of a Firearm While Engaged in the Commission of a Separate Felony, each of which the prosecution must prove beyond a reasonable doubt. These two elements are:
>
> 1. That on or about the 3rd day of June, 2011, in the City and County of Honolulu, state of Hawaii, the defendant knowingly carried on his person, knowingly had within his immediate control, intentionally used, or intentionally threatened to use a firearm whether the firearm was loaded or not and whether operable or not; and,
>
> 2. That the defendant did so while engaged in the commission of Murder in the Second Degree.

The Circuit Court gave substantially similar instructions for Counts 10-13.

On May 16, 2013, the jury returned verdicts finding, in relevant part, Stangel guilty of Counts 4, 5, and 7, and answered the special interrogatories regarding possession, threat to use, or use of a firearm in the commission of each of those Counts in the affirmative. Further, the jury returned verdicts finding Stangel guilty of Counts 9, 10, and 12, but not guilty of Counts 11 and 13.

### Sentencing

On August 14, 2013, the Circuit Court sentenced Stangel, in relevant part, as follows: (1) for Counts 4, 5, and 7, life imprisonment with the possibility of parole with a mandatory minimum term of imprisonment of twenty years in each count; and (2) for Counts 9, 10, and 12, twenty years each. Further, the Circuit Court ordered that the terms of imprisonment in Counts 4, 5, and 7 were to run consecutively. Count 9 would run concurrently with Count 4, Count 10 would run concurrently with Count 5, and Count 12 would run concurrently with Count 7.

In deciding to sentence Stangel to consecutive terms of imprisonment, the Circuit Court stated

> Regarding the State's motion for consecutive term sentencing, the applicable statutes provide that the Court must look at the factors enumerated in the general sentencing statute, I'm referring to HRS [§] 706-606, to decide whether in any particular given case consecutive term sentencing is appropriate. Now, pursuant to that statute, I've got to first consider the nature and circumstances of the offense and the history and characteristics of the defendant.
>
> First of all, regarding the history and characteristics of this defendant, we have here a 30-year old man who, according to all the available information, has been seriously abusing a variety of illegal drugs, including narcotics and ice, for more than half his life. I repeat, for more than half his life. And I see nothing in the record to indicate that he has ever made any kind of serious and sustained effort to address the problem.
>
> Additionally, based on the fact that he plead no contest to a gun charge nine years ago and the fact of his use of a semiautomatic firearm in this case, I think it's safe to infer that he's been illegally carrying around a handgun for years. You add those two things together, years of severe substance abuse and carrying a gun around, and what you've essentially got is a lethal time bomb just waiting to go off. And unfortunately for Tammy Nguyen, the Nguyen family, and the other victims in this case, the bomb did eventually go off with both lethal and near lethal consequences.
>
> In short, the defendant is an extremely dangerous person, a person who for absolutely no good reason beyond his own twisted thinking, essentially went on a killing rampage against some completely innocent and defenseless people, people who were simply trying to live their lives.
>
> Now, this brings us to the nature and circumstances of the offenses in this case.
>
> . . . . [Description of the crimes]
>
> So how do you adequately describe the nature and circumstances of this behavior? Words fail me, they really do, when I look at the utter senselessness and depravity of the defendant's actions in this case.

> Now, the law also says that the Court must consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.
>
> What this defendant did is he took the public streets and highways of this beautiful city of ours and he turned them into literal killing zones. And when I consider all of the foregoing factors, I can only conclude that they absolutely require and demand a severe sentence in this case. And I'm going to impose that sentence.

On October 11, 2013, Stangel filed a timely Notice of Appeal.

On appeal, Stangel argues that the Circuit Court erred because it (1) precluded the expert testimony of his forensic psychologist who would have testified regarding Stangel's defense of penal irresponsibility and pathological intoxication; (2) failed to instruct the jury on merger on firearms charges and mandatory minimum sentences; (3) failed to include, in the special interrogatories given to the jury, the requisite state of mind for possession, threat to use, or use of a firearm as an element of an aggravated offense; (4) considered Stangel's suppressed statement at sentencing; and (5) considered uncharged alleged misconduct unsubstantiated by the record when sentencing Stangel to consecutive terms of imprisonment.

II.

*The Circuit Court did not err when it excluded the testimony of defense witness Dr. Acklin.*

Stangel argues the Circuit Court erred in excluding Dr. Acklin's testimony because it was relevant to a determination of Stangel's penal responsibility and to the issue of pathological intoxication. While it is undisputed that Stangel was entitled to present evidence relevant to his insanity defense, Hawaii Revised Statutes (HRS) § 704-400 (2014),[2] the

---

[2] The so-called insanity defense is defined as follows:

**Physical or mental disease, disorder, or defect excluding penal responsibility.** (1) A person is not responsible, under this Code, for conduct if at the time of the conduct as a result of physical or mental disease, disorder, or defect the person lacks substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform the person's conduct to the requirements of law.

(continued...)

Circuit Court ruled that Dr. Acklin's testimony was not relevant to that defense, a decision we review *de novo*. State v. Wakisaka, 102 Hawai'i 504, 514, 78 P.3d 317, 327 (2003) ("A trial court's determination of relevance pursuant to Hawai'i Rules of Evidence (HRE) Rule 401[3] can produce only one correct result, and is therefore reviewable under the right/wrong standard").

Dr. Acklin told the Circuit Court[4] that, in his opinion, Stangel had been suffering, for a substantial period before the events underlying the charges in this case, from "a stimulant induced psychosis . . . that [] had become independent of his actual drug use[,]" and any mental disease, disorder or defect that Stangel suffered was due to voluntary substance abuse. As to the issue of pathological intoxication, Dr. Acklin testified that he had a "reasonably good understanding" of the kinds of drugs Stangel ingested prior to the incidents in question but did not know exactly what amounts of each drug Stangel ingested on the evening in question. Dr. Acklin avoided the question asking for his opinion whether the effects of these drugs on Stangel were grossly excessive in degree because, generally, over time, opiates require greater amounts for effects. However, even assuming Stangel suffered grossly excessive effects of the drugs he took on the night in question, Dr. Acklin testified that the physical abnormality causing this effect was called "sensitization," which in turn was caused by Stangel's "long use of substances."

---

[2](...continued)
HRS § 704-400(1).

[3]     HRE Rule 401 provides,

        **Definition of "relevant evidence".** "Relevant evidence"
        means evidence having any tendency to make the existence of
        any fact that is of consequence to the determination of the
        action more probable or less probable than it would be
        without the evidence.

[4]     Stangel moved the Circuit Court to reconsider its original ruling
to exclude Dr. Acklin's testimony. It was at the hearing on Stangel's motion
to reconsider that Dr. Acklin was called to testify regarding his opinions.

Intoxication[5] "does not, in itself, constitute a physical or mental disease, disorder, or defect within the meaning of [HRS] section 704-400[,]" HRS § 702-230(3) (2014), and self-induced[6] intoxication is not a defense to any offense, unless specifically provided for in HRS § 702-230. HRS § 702-230(1) (2014). A drug-induced or exacerbated mental illness does not constitute a defense. State v. Young, 93 Hawai'i 224, 232, 999 P.2d 230, 238 (2000). Therefore, the Circuit Court's decision to exclude Dr. Acklin's testimony that Stangel was suffering from a psychosis caused by Stangel's long-standing drug abuse was not error.

Nor was Dr. Acklin's testimony regarding Stangel's pathological intoxication relevant. "Pathological intoxication" is defined as

> intoxication grossly excessive in the degree, given the amount of the intoxicant, to which the defendant does not know the defendant is susceptible and which results from a physical abnormality of the defendant.

HRS § 702-230(5). The Commentary on § 702-230 further informs us that pathological intoxication is

> employed "to provide a defense in a few, extremely rare, cases in which an intoxicating substance is knowingly taken into the body and, because of a bodily abnormality intoxication of an extreme and unusual [and unforseen] degree results."[8]

---

[8] M.P.C. Tentative Draft No. 9, comments at 11-12 (1959).

Given that Dr. Acklin did not know the amounts of the multiple drugs Stangel ingested on the night in question, was reluctant to opine on whether Stangel's reaction to the ingested drugs was excessive in degree, and posited that the physical abnormality causing any excessive reaction was one caused by

---

[5] "Intoxication" is defined as "a disturbance of mental or physical capacities resulting from the introduction of substances into the body." HRS § 702-230(5).

[6] 
> "Self-induced intoxication" means intoxication caused by substances which the defendant knowingly introduces into the defendant's body, the tendency of which to cause intoxication the defendant knows or ought to know, unless the defendant introduces them pursuant to medical advice or under such circumstances as would afford a defense to a charge of a penal offense.

HRS § 702-230(5).

11

Stangel's own long-standing drug abuse, we agree with the Circuit Court that the testimony of Dr. Acklin was not relevant to establishing any defense based on a theory of pathological intoxication.

Even assuming this testimony had some probative value, the Circuit Court did not abuse its discretion, Wakisaka, 102 Hawaiʻi at 514, 78 P.3d at 327 (the determination of the admissibility of relevant evidence under rule excluding relevant evidence on grounds of prejudice, confusion, or waste of time "is eminently suited to the trial court's exercise of its discretion because it requires a 'cost-benefit calculus' and a 'delicate balance between probative value and prejudicial effect'") (citation and internal quotation marks omitted), when it excluded Dr. Acklin's testimony because this probative value would be substantially outweighed by the confusion of the issues it would cause. State v. Fukagawa, 100 Hawaiʻi 498, 506, 60 P.3d 899, 907 (2002) ("[I]t is well-settled that [a]n appellate court may affirm a judgment of the lower court on any ground in the record that supports affirmance.") (citation and internal quotation marks omitted). As the Circuit Court noted, if it admitted Dr. Acklin's testimony, it would also have to instruct the jury that the law did not recognize the effects of Stangel's voluntary intoxication as constituting a defense. As Stangel does not argue this testimony was relevant to any other subject, it was not an abuse of discretion to exclude testimony that the jury would be told was not relevant to any defense.

*The Circuit Court Did Not Plainly Err When It Did Not Issue Instructions or Interrogatories Regarding Merger to the Jury.*

Relying on HRS § 701-109(1)(e) (2014), Stangel next argues that the Circuit Court plainly erred in failing to present special interrogatories regarding merger to the jury. He maintains that, as his convictions for Counts 4, 5, 7, 9, 10, 12, and 14 all involve possession of the same firearm, "[t]he question of whether Stangel's conduct relat[ing] to the firearm constituted separate and distinct culpable acts or was an uninterrupted continuous course of conduct should have been submitted to the jury for determination." In addition, Stangel

argues that "whether [he] committed the firearms offenses, and the conduct creating the mandatory minimum sentences under HRS § 706-660.1, with separate and distinct intents, rather than acting with one general impulse and one plan to commit all of the offenses should also have been submitted to the jury." He asks that the case be remanded for the prosecution to either elect one of these seven convictions or to retry the case with a merger instruction.

HRS § 701-109(1)(e) provides,

(1)    When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. The defendant may not, however, be convicted of more than one offense if:

. . . .

(e)    The offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law provides that specific periods of conduct constitute separate offenses.

In Count 4, Stangel was convicted of Murder in the Second Degree for intentionally or knowingly causing the death of Tammy Nguyen and in Counts 5 and 7 for intentionally taking a substantial step intended or known to cause the death of Michael Pagdilao and Amie Lou Asuncion, respectively, thereby committing the offense of Attempted Murder in the Second Degree with regard to each. HRS §§ 707-701.5 (2014) and 705-500 (2014).[7] The

---

[7]    HRS § 707-701.5(1) provides: "Except as provided in section 707-701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person." HRS § 707-701 (2014) defines Murder in the First Degree, and provides:

(1)    A person commits the offense of murder in the first degree if the person intentionally or knowingly causes the death of:

(a)    More than one person in the same or separate incident;

(b)    A law enforcement officer, judge, or prosecutor arising out of the performance of official duties;

(c)    A person known by the defendant to be a witness in a criminal prosecution and the killing is related to the person's status as a witness;

(d)    A person by a hired killer, in which event both the person hired and the person responsible for hiring the killer shall be punished under this section;

(e)    A person while the defendant was imprisoned;

(continued...)

13

crimes of Murder in the Second Degree and Attempted Murder in the Second Degree are not defined as a continuing course of conduct. See State v. Matias, 102 Hawai'i 300, 305, 75 P.3d 1191, 1196 (2003) (quoting State v. Hoopii, 68 Haw. 246, 251, 710 P.2d 1193, 1197 (1985)) ("HRS § 701-109(1)(e) . . . does not apply where a defendant's actions constitute separate offenses under the law.") Each commission is complete upon either performing the act that causes the death or which is a substantial step towards causing "the death of another person."[8]  Therefore, these three offenses

---

[7](...continued)

    (f)    A person from whom the defendant has been restrained, by order of any court, including an ex parte order, from contacting, threatening, or physically abusing pursuant to chapter 586;

    (g)    A person who is being protected by a police officer ordering the defendant to leave the premises of that protected person pursuant to section 709-906(4), during the effective period of that order;  or

    (h)    A person known by the defendant to be a witness in a family court proceeding and the killing is related to the person's status as a witness.

HRS § 705-500, defining criminal attempts, provides:

(1)    A person is guilty of an attempt to commit a crime if the person:

    (a)    Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or

    (b)    Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.

    (2)    When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

    (3)    Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

[8]    Moreover, we note that Stangel was charged, in Count 3, with Attempted Murder in the First Degree under HRS § 707-701(1)(a), which alleged that Stangel "did intentionally engage in conduct which is a substantial step in a course of conduct intended or known to cause the deaths of more than one person in the same or separate incident[.]"  This charge is defined as a
(continued...)

would not merge as a matter of law, and no jury instruction or separate verdict question was necessary.

Similarly, the offense of Carrying or Use of a Firearm in the Commission of a Separate Felony (Use of Firearm),[9] as its name implies, is complete upon the commission of the underlying felony. The Use of Firearm statute specifically provides that conviction for Use of Firearm is in addition to the conviction and sentence for the underlying felony. HRS § 134-21(b) (2011);

---

[8](...continued)
continuing course of conduct. State v. Arceo, 84 Hawai'i 1, 18, 928 P.2d 843, 860 (1996). The charges of Attempted Murder in the First Degree versus Murder in the Second Degree and multiple counts of Attempted Murder in the Second Degree differ in that the states of mind required for each are mutually exclusive. See Briones v. State, 74 Haw. 442, 457, 848 P.2d 966, 974 (1993). As the jury rejected the charge of Attempted Murder in the First Degree but convicted Stangel of one count of Murder in the Second Degree and two counts of Attempted Murder in the Second Degree involving three separate persons, in different locations, the jury must have found that Stangel did not act with the intent or plan to kill multiple persons, i.e., as a serial killer, but rather that he intended to kill each separately. Briones, 74 Haw. at 454-57, 848 P.2d at 973-75.

[9]
> **Carrying or use of firearm in the commission of a separate felony; penalty.** (a) It shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, whether the firearm was loaded or not, and whether operable or not; provided that a person shall not be prosecuted under this subsection when the separate felony is:
>
> (1) A felony offense otherwise defined by this chapter;
>
> (2) The felony offense of reckless endangering in the first degree under section 707-713;
>
> (3) The felony offense of terroristic threatening in the first degree under section 707-716(1)(a), 707-716(1)(b), or [707-716(1)(e)]; or
>
> (4) The felony offenses of criminal property damage in the first degree under section 708-820 or criminal property damage in the second degree under section 708-821 and the firearm is the instrument or means by which the property damage is caused.
>
> (b) A conviction and sentence under this section shall be in addition to and not in lieu of any conviction and sentence for the separate felony; provided that the sentence imposed under this section may run concurrently or consecutively with the sentence for the separate felony.
>
> (c) Any person violating this section shall be guilty of a class A felony.

HRS § 134-21.

15

see State v. Brantley, 99 Hawai'i 463, 465-66, 56 P.3d 1252, 1254-55 (2002) and State v. Feliciano, 107 Hawai'i 469, 481, 115 P.3d 648, 660 (2005) ("We [] hold that the double jeopardy clause does not constrain the legislature from intentionally imposing multiple punishments upon a defendant for separate offenses arising out of the same conduct."). Therefore, the Use of Firearms convictions in Counts 9, 10, and 12 would not merge with the underlying Murder In the Second Degree and Attempted Murder in the Second Degree charges as a matter of law and no instruction on merger was necessary.

We next turn to Stangel's conviction for Place to Keep Pistol or Revolver (Place to Keep)[10] in Count 14. This offense is not defined as a continuing course of conduct; it is a prohibition against transporting firearms. Once the person takes the firearm out of a place of business, residence, or sojourn-- but for certain exceptions--the offense is complete. The fact that the offense may continue beyond this point does not change the character of the offense.

Instructive is the long-standing case of State v. Hoopii, 68 Haw. 246, 710 P.2d 1193 (1985). There, the court reviewed Hoopii's conviction for Kidnapping, Rape in the First Degree, and Sodomy in the First Degree, and reasoned,

> HRS § 701-109(1)(e) prohibits multiple convictions where the defendant's actions constitute an uninterrupted, continuing course of conduct. This prohibition, however, does not apply where these actions constitute separate offenses under the law. Furthermore,
>
> > where a defendant in the context of one criminal scheme or transaction commits several acts independently violative of one or more statutes, he may be punished for all of them if charges are properly consolidated by the State in one trial.
>
> State v. Pilago, 65 Haw. 22, 24, 649 P.2d 363, 365 (1982); State v. Pia, 55 Haw. 14, 19, 514 P.2d 580, 585 (1973).

_____

[10]     The offense of Place to Keep is defined in HRS § 134-25 (2011) and provides, in pertinent part:

> **[§ 134-25] Place to keep pistol or revolver; penalty.** (a) . . . all firearms shall be confined to the possessor's place of business, residence, or sojourn[.]
>
> . . . .
>
> (b)     Any person violating this section by carrying or possessing a loaded or unloaded pistol or revolver shall be guilty of a class B felony.

> In this case, Appellant committed and completed the act of kidnapping at the moment he restrained the victim by abducting her, putting her in his van and driving away. Any restraint which continued throughout the subsequent rape and sodomy was not necessary to the perpetration of the kidnapping. See State v. DeCenso, 5 Haw. App. 127, 135, 681 P.2d 573, 580 (1984). Appellant would still be subject to prosecution for kidnapping had he not continued to restrain the victim throughout the rape and sodomy. Moreover, these later acts themselves constituted separate and independent offenses.

Hoopii, 68 Haw. at 251-52, 710 P.2d at 1197 (footnote omitted). See also State v. Momoki, 98 Hawai'i 188, 195, 46 P.3d 1, 8 (App. 2002) (impaired driving offense complete upon driving or assuming control of vehicle; that impaired driving continued through commission of separate offense of inattention to driving not violative of HRS § 701-109(1)(e)).

Similarly, Stangel committed the offense of Place to Keep when he left his home with the loaded firearm. That he continued to have the firearm during the entire episode of June 3, 2011 and committed other offenses with that same firearm was not necessary to the commission of the Place to Keep offense. As Place to Keep is not defined by statute as a continuing course of conduct offense,[11] HRS § 701-109(1)(e), the Circuit Court was not required to instruct the jury to decide whether Stangel engaged in an uninterrupted course of conduct as a matter of fact.

Nor was the Circuit Court required to instruct the jury to decide whether Stangel committed all "the firearms offenses, and the conduct creating the mandatory minimum sentences under HRS § 706-660.1, with separate and distinct intents, rather than acting with one general impulse and one plan to commit all of the offenses[.]" First, HRS § 706-660.1 (2014),[12] by its terms,

---

[11] Stangel's citation to State v. Matias, 102 Hawai'i 300, 306, 76 P.3d 1191, 1197 (2003) and State v. Padilla, 114 Hawai'i 507, 517, 164 P.3d 765, 774 (App. 2007) following Matias, are not persuasive. Both cases concerned the possible merger of Place to Keep and Ownership or Possession Prohibited (Felon in Possession) under HRS § 134-7(b) and (h) (2011) convictions. Here, Stangel completed commission of the offense of Place to Keep as soon as he left his residence with the firearm and without a permit. His subsequent actions in committing each of the underlying felonies in each of the Use of Firearm offenses were therefore separate from the Place to Keep offense.

[12]
§ 706-660.1. Sentence of imprisonment for use of a firearm, semiautomatic firearm, or automatic firearm in a
(continued...)

17

[12](...continued)

**felony.** (1) A person convicted of a felony, where the person had a firearm in the person's possession or threatened its use or used the firearm while engaged in the commission of the felony, whether the firearm was loaded or not, and whether operable or not, may in addition to the indeterminate term of imprisonment provided for the grade of offense be sentenced to a mandatory minimum term of imprisonment without possibility of parole or probation the length of which shall be as follows:

    (a) For murder in the second degree and attempted murder in the second degree--up to fifteen years;

    (b) For a class A felony--up to ten years;

    (c) For a class B felony--up to five years; and

    (d) For a class C felony--up to three years.

The sentence of imprisonment for a felony involving the use of a firearm as provided in this subsection shall not be subject to the procedure for determining minimum term of imprisonment prescribed under section 706-669; provided further that a person who is imprisoned in a correctional institution as provided in this subsection shall become subject to the parole procedure as prescribed in section 706-670 only upon the expiration of the term of mandatory imprisonment fixed under paragraph (a), (b), (c), or (d).

    (2) A person convicted of a second firearm felony offense as provided in subsection (1) where the person had a firearm in the person's possession or threatened its use or used the firearm while engaged in the commission of the felony, whether the firearm was loaded or not, and whether operable or not, shall in addition to the indeterminate term of imprisonment provided for the grade of offense be sentenced to a mandatory minimum term of imprisonment without possibility of parole or probation the length of which shall be as follows:

    (a) For murder in the second degree and attempted murder in the second degree--twenty years;

    (b) For a class A felony--thirteen years, four months;

    (c) For a class B felony--six years, eight months; and

    (d) For a class C felony--three years, four months.

The sentence of imprisonment for a second felony offense involving the use of a firearm as provided in this subsection shall not be subject to the procedure for determining a minimum term of imprisonment prescribed under section 706-669; provided further that a person who is imprisoned in a correctional institution as provided in this subsection shall become subject to the parole procedure as prescribed in section 706-670 only upon expiration of the term of mandatory imprisonment fixed under paragraph (a), (b), (c), or (d).

(continued...)

is a sentencing provision and not a separate offense. Secondly, to the extent that HRS § 706-660.1 was included in the charge,[13] it was not an element of that charged offense, HRS § 702-205 (2014)[14] either by operation of law, or by terms of the charge

---

[12](...continued)

    (3)    A person convicted of a felony, where the person had a semiautomatic firearm or automatic firearm in the person's possession or used or threatened its use while engaged in the commission of the felony, whether the semiautomatic firearm or automatic firearm was loaded or not, and whether operable or not, shall in addition to the indeterminate term of imprisonment provided for the grade of offense be sentenced to a mandatory minimum term of imprisonment without possibility of parole or probation the length of which shall be as follows:

    (a)    For murder in the second degree and attempted murder in the second degree--twenty years;

    (b)    For a class A felony--fifteen years;

    (c)    For a class B felony--ten years; and

    (d)    For a class C felony--five years.

The sentence of imprisonment for a felony involving the use of a semiautomatic firearm or automatic firearm as provided in this subsection shall not be subject to the procedure for determining a minimum term of imprisonment prescribed under section 706-669; provided further that a person who is imprisoned in a correctional institution as provided in this subsection shall become subject to the parole procedure as prescribed in section 706-670 only upon expiration of the term of mandatory imprisonment fixed under paragraph (a), (b), (c), or (d).

    (4)    In this section:

"Automatic firearm" has the same meaning defined in section 134-1.

"Firearm" has the same meaning defined in section 134-1 except that it does not include "semiautomatic firearm" or "automatic firearm".

"Semiautomatic firearm" means any firearm that uses the energy of the explosive in a fixed cartridge to extract a fired cartridge and chamber a fresh cartridge with each single pull of the trigger.

[13]    HRS § 706-660.1 was included in Counts 4, 5, and 7, but not 9, 10, 12, or 14.

[14]

    §702-205 **Elements of an offense.** The elements of an offense are such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as:

                (continued...)

itself.[15]  Moreover, Stangel presents no authority for the proposition that the jury must make a finding regarding his intent with respect to a sentencing provision, and we find none.

Therefore, we conclude that the Circuit Court did not plainly err in omitting merger instructions to the jury.

*The Circuit Court Did Not Plainly Err in Omitting a Mens Rea Requirement Relating to Qualifying Facts for Mandatory Minimum Sentences From the Special Interrogatories.*

Stangel argues that the Circuit Court plainly erred when it failed to include a *mens rea* requirement in the special interrogatories for Counts 4, 5, and 7, asking the jury to determine whether facts qualifying Stangel for mandatory minimum sentencing under HRS § 706-660.1 were present.  Stangel argues that, because the *mens rea* for the charged offense applies to all elements of the offense and the qualifying facts for imposition of a mandatory minimum sentence for that offense are considered elements of the offense, the jury must be instructed that it must find Stangel acted with the requisite state of mind with regard to these qualifying facts as well.  The special interrogatories did not contain a *mens rea* element.[16]  Stangel did not object to

---

[14] (...continued)
      (a)    Are specified by the definition of the offense, and

      (b)    Negative a defense (other than a defense based on the statute of limitations, lack of venue, or lack of jurisdiction.

[15]    Counts 4, 5, and 7 each contained a separate paragraph, which read, in pertinent part,

      If convicted of this offense or any included felony offense, TOBY J. STANGEL may be subject to sentencing in accordance with Section 706-660.1 . . . .

[16]    The special interrogatory accompanying Count 4 stated

      "Did the defendant have in his possession or threaten its use or use a semi-automatic firearm whether loaded or not and whether operable or not while engaged in the commission of Murder in the Second Degree or Reckless Manslaughter in Count 4?" Your answer must be unanimous. If you are unable to come to a unanimous answer, then you must not check off either "Yes" or "No" on the interrogatory form.

(continued...)

the instructions at trial. Consequently, these un-objected to jury instructions are reviewed for plain/harmless error. See State v. Nichols, 111 Hawai'i 327, 334-35, 141 P.3d 974, 981-92 (2006).

We need not decide whether the special interrogatories were erroneous under the circumstances of this case, as we conclude that the error, if any, was harmless. "In analyzing alleged errors in special verdict forms, the instructions and the interrogatories on the verdict form are considered as a whole." Montalvo v. Lapez, 77 Hawai'i 282, 292, 884 P.2d 345, 355 (1994). The jury found Stangel guilty of predicate felonies under Counts 4, 5, and 7, and also found Stangel guilty of respective Counts 9, 10, and 12 for Use of Firearm. Counts 9, 10, and 12 required, and the jury so found, that Stangel "knowingly carrie[d] on his person, knowingly ha[d] within his immediate control, intentionally use[d], or intentionally threaten[ed] to use a firearm while engaged in the commission of a separate felony." Thus the jury unanimously decided that Stangel intentionally or knowingly possessed a firearm in the commission of each predicate felony.

Stangel does not suggest any scenario in which the same jury that found that he knowingly possessed a firearm in each of the charged felony offenses could have found that Stangel did not knowingly possess a firearm for the same predicate felonies for the purposes of HRS § 706-660.1.

Stangel's third asserted point of error is without merit.

> *The Record Does Not Support the Allegation That*
> *the Circuit Court Considered Stangel's Suppressed*
> *Statement in Sentencing.*

Stangel argues that the Circuit Court violated his right to due process under the Hawai'i and Federal Constitutions because it considered his suppressed statements at the sentencing

---

[16](...continued)
Substantially similar special interrogatories accompanied Counts 5 and 7.

hearing. As Stangel acknowledges, he did not object to inclusion of, nor move to strike, the material from the Presentence Diagnosis and Report (PSI) but argues that this plain error affected his substantial rights. State v. Fagaragan, 115 Hawai'i 364, 368, 167 P.3d 739, 743 (App. 2007) ("[W]here plain errors were committed and substantial rights were affected thereby, the errors may be noticed although they were not brought to the attention of the trial court.") (citation, internal quotation marks and brackets omitted).

We find no plain error here. Generally, the sentencing court is not only entitled to consider, but must give "due consideration to" the PSI before imposing sentence. HRS § 706-601 (2014); State v. Hussein, 122 Hawai'i 495, 527, 229 P.3d 313, 345 (2010). This mandate is not without limit, as in the example of statements that have been suppressed. State v. Valera, 74 Haw. 424, 848 P.2d 376 (1993). However, "[i]t is well established that a judge is presumed not to be influenced by incompetent evidence and the normal rule is that if there is sufficient competent evidence to support the judgment or finding below, there is a presumption that any incompetent evidence was disregarded and the issue determined from a consideration of competent evidence only." State v. Barros, 105 Hawai'i 160, 171, 95 P.3d 14, 25 (App. 2004) (internal citations, quotations and brackets omitted).

Here, the Circuit Court ordered the suppression of Stangel's statement and was thus well aware that the statement had been suppressed. Stangel does not identify what portions of his suppressed statement were used by the Circuit Court in imposing sentence. On the other hand, there was a wealth of eligible information at the Circuit Court's disposal in rendering its sentencing decision: the records and files in the case, including the evidence admitted at trial, the statements from counsel at sentencing, and letters from the families of the victims and Stangel. In addition to the unusually violent and seemingly random acts involved in this case, there was Stangel's history of abusing a variety of illegal drugs for more than half

22

of his life without any kind of serious or sustained effort to address the problem, and Stangel's previous arrest for illegal gun possession. The Circuit Court's conclusion that "[Stangel] is an extremely dangerous person, a person who for absolutely no good reason beyond his own twisted thinking, essentially went on a killing rampage against some completely innocent and defenseless people[,]" and that there was a "need for the sentence imposed to . . . protect the public from further crimes of the defendant[,]" appears supported by the record independent of the information included in the synopsis of Stangel's suppressed statement and therefore Stangel fails to rebut the presumption that the Circuit Court was unaffected by the inclusion of suppressed evidence in the PSI.[17]

> *The Consideration of Uncharged and Unsubstantiated Illegal Conduct to Support Imposition of Consecutive Sentences Was Plain Error.*

Stangel argues that the Circuit Court unconstitutionally punished him for "illegally carrying around a handgun for years" without substantiation in the record. Again, Stangel asks this court to review the Circuit Court's action for plain error.

"The authority of a trial court to select and determine the severity of a penalty is normally undisturbed on review in the absence of an apparent abuse of discretion or unless applicable statutory or constitutional commands have not been observed." State v. Reis, 115 Hawai'i 79, 83, 165 P.3d 980, 984 (2007) (citation and internal quotation marks omitted). However,

> While a court has broad discretion in imposing a sentence, and can consider the candor, conduct, remorse and background of the defendant as well as the circumstances of the crime and many other factors, a judge cannot punish a defendant for an uncharged crime in the belief that it too deserves punishment.

---

[17]    Stangel also argues that "other information" included in the PSI provide additional bases to vacate his sentence. As Stangel did not object to this information being included in the PSI at sentencing, did not dispute the information before the sentencing court and does not identify the information or explain why he believes it was improperly included, he has waived this argument and failed to show plain error justifying our notice.

State v. Vellina, 106 Hawai'i 441, 450, 106 P.3d 364, 373 (2005) (quoting State v. Nunes, 72 Haw. 521, 526, 824 P.2d 837, 840 (1992)).

Vellina and Nunes are cases in which the Hawai'i Supreme Court found plain error in the trial court's reliance upon uncharged and unsubstantiated criminal conduct in imposing sentence. In Nunes, the trial court increased a two-day jail term to thirty days based on the court's belief that the victim "lied for the defendant." Nunes, 72 Haw. at 525, 824 P.2d at 840. In Vellina, the trial court imposed consecutive terms based on the government's argument that the defendant had sold the semiautomatic weapon he had stolen in that case to a "drug dealer." 106 Hawai'i at 449, 106 P.3d at 372.

Here, evidence was presented at the sentencing phase of the jury trial that, in 2004, Stangel received a deferred acceptance of a no contest plea to a charge of Place to Keep and that he had been found guilty in the instant case of two or more felonies, including firearms offenses. The State does not point to any evidence in the record of Stangel's possession of firearms in the interim.[18] The Circuit Court explicitly considered the factors contained in HRS § 706-606 (2014)[19] before imposing

---

[18] We note that, in Dr. Acklin's January 20, 2012 report, he includes a synopsis of his interview of Stangel's girlfriend, who had lived with Stangel for six to seven months at the time of the incident. In that interview, Leslie Guerra told Dr. Acklin that Stangel "kept a gun at the house[.]" Dr. Acklin's report was included as an attachment to the PSI.

[19] HRS § 706-606 provides:

**Factors to be considered in imposing a sentence.** The court, in determining the particular sentence to be imposed, shall consider:

    (1)    The nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)    The need for the sentence imposed:

        (a)    To reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense;

        (b)    To afford adequate deterrence to criminal conduct;

(continued...)

sentence, and communicated its ruling first at the hearing on the
State's motion for consecutive sentencing:

> Additionally, based on the fact that [Stangel pled] no
> contest to a gun charge nine years ago and the fact of his
> use of a semiautomatic firearm in this case, <u>I think it's
> safe to infer that he's been illegally carrying around a
> handgun for years</u>. You add those two things together, years
> of severe substance abuse and carrying a gun around, and
> what you've essentially got is a lethal time bomb just
> waiting to go off.  And unfortunately for Tammy Nguyen, the
> Nguyen family, and the other victims in this case, the bomb
> did eventually go off with both lethal and near lethal
> consequences.

(Emphasis added).  In its September 3, 2013 Findings of Fact,
Conclusions of Law, and Order Granting State's Motion for
Consecutive [Terms of] Imprisonment (Order Granting Consecutive
Terms) the Circuit Court later memorialized the reasons why it
concluded that, under the factors contained in HRS § 706-606,
consecutive sentences were warranted:

> This court bases this conclusion on the facts adduced during
> trial, the PSI, State's Motion, and Defendant's Sentencing
> Statement.  Defendant's combination of severe substance
> abuse and propensity for illegally carrying loaded
> semiautomatic firearms created a lethal time bomb.  This
> time bomb went off on June 3, 2011, when Defendant took the
> public streets and highways of Honolulu and turned them into
> literal killing zones.  Thus, in considering [] all of the
> foregoing factors, the court can only conclude that they
> require and demand a severe sentence.

We agree with Stangel that basing the decision to
impose consecutive terms on the speculation that Stangel
illegally carried a firearm "for years" before the instant
offense, was improper.  <u>Vellina</u>, 106 Hawai'i at 450, 106 P.3d at
375.  As this notion was a prominent part of the Circuit Court's

---

[19](...continued)

    (c)    To protect the public from further crimes
of the defendant; and

    (d)    To provide the defendant with needed
educational or vocational training,
medical care, or other correctional
treatment in the most effective manner;

(3)    The kinds of sentences available; and

(4)    The need to avoid unwarranted sentence
disparities among defendants with similar
records who have been found guilty of similar
conduct.

reasons supporting its decision, we cannot conclude that the consideration of this speculation was harmless and must vacate this part of Stangel's sentence.

### III.

Based on the foregoing, we vacate the part of the sentence that imposed consecutive terms of incarceration for Counts 4, 5 and 7, and remand for resentencing before another judge. The August 14, 2013 Judgment of Conviction and Sentence is affirmed in all other respects.

DATED:  Honolulu, Hawai'i, February 26, 2015.

On the briefs:

Craig W. Jerome,
Deputy Public Defender,
for Defendant-Appellant.

Donn Fudo,
Deputy Prosecuting Attorney,
City and County of Honolulu,
for Plaintiff-Appellee.

Presiding Judge

Associate Judge

Associate Judge